The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Welcome to the Fourth Circuit. We're prepared to hear our argument in our first case, Perry v. Berryhill, Ms. Baina. We'll be glad to hear from you. Thank you. May it please the Court, my name is Christine Baina. I'm here today representing William Perry, who in October 2012 had a massive and debilitating stroke. I understand that one of your principal issues is whether or not he sufficiently recovered. And I'd like to begin then with pointing out that Mr. Perry only had to establish that he was disabled for any 12-month period. Once he did that, he had to be found disabled. The later periods, the burden of proof would shift to the agency to show medical improvement and medical improvement sufficient for him to work. The ALJ's decision in this case rested solely on evidence selected to support her conclusion. She omitted evidence establishing that Mr. Perry could not perform basic work tasks or work a full day. She failed to analyze his relevant complaints and clinically demonstrated deficits alone or in combination. Can I ask you, Counsel, about that statement you just made about your client not being able to work a full day or week? Yes, sir. Where in the record is the evidence supporting that proposition? Because, frankly, we have looked for it. I couldn't find it. Can you point me to something in the record that supports that notion? Of course, Your Honor. Mr. Perry testified and stated in his function reports that he needed to lie down and rest during the day. That means he can't sustain a full eight-hour day. So his statements, that's it? That's what you're relying on? Yes. Okay. No medical evidence supporting the notion that he can't work a full day or work week? Exactly. And his statements in this... Exactly, that there is no evidence other than his statement? Is that what you're saying? No direct evidence. There's indirect evidence, yes. What is that? The therapist's records show that as he got tired or was under any stress, he would just deteriorate. His performance, he would become confused. More importantly, however, the case law, and it's actually the case law written by this court, that then led to the agency being forced to adopt the rules, his subjective complaints that he needed to rest during the day do not need objective evidence support. Once he has said it... But you're not arguing that a witness's statement in and of itself is evidence without contradiction? I am not aware... It's not abusive. I'm not sure. That's exactly my point. The agency has to show that he could work. Once he has said it... Didn't two state psychologists say that he could work full-time with minimal interruptions? I'm sorry? I'm sorry. Didn't both of the state psychologists say that he could work full-time with minimal interruptions only? I mean, isn't that the contrary evidence? Actually not, because there's nothing... The medical opinions are only as good as the evidence underlying them. It's like the same across the board with all medical opinions. In 404.15.27, where it talks about the weight of opinion, it says that you have to consider the support and you have to consider the consistency with the record, and if there is no support, then those particular... And that's probably my major point here. They're not supported. They have no evidence he could work a full day. There's nothing here that says he could. And there's a lot that says he couldn't, suggests that he couldn't, both the therapist's records and his own statements. I don't want to cut off your answer to Judge Harris's question, but let's go back to Judge Diaz's initial question. What's the evidence that he wasn't able to work besides his own testimony? Okay. And then you can circle back to why the State's evidence was not capable of belief or was not credible or not supported. Of course. Mr. Perry had his stroke, and as you know, initially, the first day or two, he was in very terrible shape. Then there was some small improvement for a couple of weeks, but he reverted to, and this is in his therapist's records, the rehabilitation records, he reverted... I'm sorry. My voice actually carries pretty well. He reverted to requiring supervision in his daily activities. He could cook, but he couldn't cook on his own. He could pay bills, but he couldn't pay bills on his own. More than 10 months after his stroke, it's documented in the therapist's records, he could not repeat a 10-word sentence accurately. Please look in the fridge and hand me the ketchup. Couldn't do it. He could read two paragraphs of a simple sports article at that point with a ruler, but he could not read charts, graphs, couldn't complete SSA forms. His improvement had plateaued. In a supportive clinical setting, he still had a 20% error rate on three-step tasks and a 50% error rate on four-step tasks. He could drive, but only when he was accompanied. He could not drive alone for a very short period of time, and in a very rural setting. He lived in Linden, Virginia, if you know where that is, up between Delaplane and Front Royal. It was about 10 minutes to the store and back. So you're saying all this goes to why he wasn't able to work? Yes, sir. Yes, sir. Is it related to the part where he has to nap during the day, or is this another reason why he can't work? This is additional. Well, is there any other evidence, any indirect evidence, I think you refer to, about sort of his putting to one side mental limitations, but sort of his physical capacity to work without too much interruption because he needs to nap? Needing to nap or fatigue is a common and expected effect of encephalomalacia and hydrocephalus. So you have his statement, and then the indirect evidence is that it would be sort of an expected symptom. Yes, and in addition, the administrative law judge found that his subjective complaints could be reasonably expected to derive from particular impairments related to his stroke. So the judge has already said, yes, this is perfectly reasonable. This could be happening. At that point, the case law in this circuit is that he does not require additional objective evidence. There has to be something more. In addition, in answer to your question, he told judge, and he told her twice. Actually, he told her three times because he told her again indirectly in his testimony. But he told her twice. My neurologist has told me not to work. My neurologist has told me not to exert myself, which does go to the fatigue issue. My neurologist has told me not to lift, which is sensible given that lifting raises your blood pressure. Is there evidence from the neurologist in the record then? I'm sorry? Is there evidence from the neurologist in the record to back up what you just said? No, and that's a very interesting point because it's the ALJ's obligation. She knew, she had every reason to believe that opinion had been given, those directions had been given to Mr. Perry. Didn't you or whoever was counsel below tell the ALJ that? I'm sorry? Didn't you or whoever was counsel below tell the ALJ that the record was complete? I understand that. However, that is not, and for, oh, from Mr. Landau's point of view, it was complete. He had enough to win the case because he's got all this, the error rates, all the rest of those things. He's unable to prove a 10-word sentence. He only has to prove 12 months. He doesn't have to prove years and years and years, only the 12 months, and he's got that. And it doesn't matter because in this case, or actually all of the cases, under the record, first of all, the regulations, let me see if I can give you a specific site, say that, the regulations say that when there's evidence that an impairment or set of limitations exists, such as not being able to work, it is the agency's obligation. It says we will obtain when there's reason to believe that this may be, this evidence may exist. We will go get it. Before your time runs out, if we could circle back to the question Judge Harris asked. So you've got this evidence that you've recited, and then there's evidence from the other physicians and healthcare providers that's contradictory. So at that point, what's your position as to, I mean, I thought where you were going was that you were going to say that that evidence is a matter of law, could not overcome your client's testimony. That's true. And it's true because as Judge Harris pointed out, we have these opinions from the state agency. They have no evidence that he could work a full day. They have no evidence he could work a full week. They have no evidence he could remember even short, simple instructions. Are their opinions incredible as a matter of law? How do you classify them? Oh, I don't do credibility with opinions. They're either supported and consistent with the record, or they are not. I've seen opinions, of course, that I didn't believe were credible. But the major point here is that these decisions, these particular conclusions from the state agency, these are doctors, they're not treating physicians, and there is no evidence in the record to disprove what Mr. Perry had said about I have to rest every day. And the ALJ found that was reasonable. And the ALJ, although the ALJ says he gave the state agency opinions great weight, in fact he left out portions of them, they stated they find, for example, that he was limited to one and two-step tasks. The ALJ didn't pick that up, said not a word about it in her decision. There's nothing there. But once, under the Cooks and Heckler's and those cases, once he has testified under oath, there has to be something to disprove him. Okay, you've got some time left on rebuttal. Okay. Thank you. I did want to point out with respect to one and two-step tasks, because that was omitted not only from the ALJ's decision, but also from her question to the vocational expert, that Sizemore, cited by the agency, also talked about one and two-step tasks coming from the opinions. Counsel, your red light's been on. That's your signal to help. Oh, I'm sorry. It's still counting down. I think that's going over time. It starts counting up. Right. So you can come back and talk to us on rebuttal. I can talk to you in a minute. I will. Ms. Kimball. Thank you. May it please the Court, I'm Assistant United States Attorney Kimmery Kimball, here today on behalf of the Social Security Administration. Plaintiff Appellant William Perry had a stroke on October 19, 2012, at the age of 46. But following his stroke, the full panoply of doctors and therapists treating Mr. Perry reported that he was recovering extremely well. His neurologist consistently reported that he was doing remarkably well and that he had recovered exceedingly well. Just three weeks after his stroke, Mr. Perry's physical therapist discharged him because his symptomology was so rapidly recovering that she was unable to discover physical deficiencies to justify skilled physical therapy. Six weeks after his stroke, Mr. Perry's occupational therapist discharged him because he had met all pertinent goals. Eight weeks after his stroke, his primary care physician noted that he had very little residual effects from the stroke. Within 12 weeks of his stroke, Mr. Perry had met most of his speech therapy treatment goals and after 10 months, he was discharged because he had met virtually all of his goals. Based on this extensive evidence of Mr. Perry's remarkable recovery, the Social Security Administrative Law Judge determined that he was not disabled for a period of at least 12 months, as required under the Social Security Act, and that he could perform work in the national economy.  Can you tell me how the RFC and, through the RFC, the hypothetical question to the vocational expert accounted for that? Absolutely. The ALJ adopted the state doctor's opinions that he had only moderate difficulties in concentration, persistence, and pace. And then the ALJ, at Administrative Record 37, I believe, I'm sorry, at Administrative Record 36, specifically noted that because of these difficulties, because he continued to have mild forgetfulness and because he had met the vast majority of his speech therapy goals, which included his ability to follow directions, that she was limiting his RFC to only unskilled work in a non-production-oriented work setting. And we held in, I don't know how to pronounce it, but Masio, that limiting it to unskilled work wasn't sufficient. So for you, is this all about the non-production-oriented work setting? Is that how you would distinguish Masio? So Masio can be distinguished in two ways with this case. First is the non-production work setting, which does account for his issues with pace. How is that true? I mean, aren't there lots of non-production jobs that move at a fast pace? Because he's not being evaluated on the basis of his production, because he doesn't have to move constantly. What does non-production-related mean? Non-production-oriented. I couldn't find that in the regulations. Is that like a thing? As I understand it, a non-production-oriented work setting is one that's not, for example, on an assembly line or somewhere where he's constantly moving. So you understand non-production-oriented work setting to mean not a fast pace? I thought it just meant you're not on an assembly line. Not on a production schedule. So on an assembly line or if you have to complete a certain number of tasks within a certain period of time. That's what that means? On a production-oriented work setting. Did the ALJ explain what that means somewhere? She did not. Where would I find out what that means? I mean, I think she was just using the term as is used generally. I guess I'm just saying I'm not familiar with the term, so is there somewhere in the regulations I can look to find out what that means? I don't believe so. I think she just meant that he isn't limited to or he has to be limited to a job where he doesn't have to work on a constant basis. On a fast pace. It can't be fast. You read that. I mean, your understanding is the ALJ means that means it can't be a fast-paced job. I would say fast-paced or alternatively production where the production goal is the basis of measurement. So even if you only have to do one or two tasks within an hour, it's not the number of tasks per hour that's determinative of your success in the job. Okay. From my perspective, I'm troubled by this because I did not know that's what it meant and nothing in the opinion explained to me that that's what it meant or why this would address his limitations, and I can't find a definition of this in any kind of official document. So what am I supposed to do given that state of affairs? I think it just has to be the general meaning of non-production oriented. I don't think that has a general meaning. I actually literally thought it meant you're not producing things, you're not working on an assembly line, but you think it has sort of a colloquial. I could look it up in the dictionary and I would get that that means not fast-paced. Well, so I think it is that you're not producing things on a constant basis, whether that be on an assembly line or not. But it could be that if you have to sort mail and you have to get through a certain number of letters by the end of your shift, would that be production oriented work or non-production oriented work? You're not making anything. Honestly, Your Honor, I don't know. Okay. As I read the opinion, I understood the non-production oriented work setting to be that you don't have to produce a certain number of things within a certain period of time. You might have to sort a certain number of letters within a certain amount of time. I understood it to mean you don't have to do a certain number of tasks within a certain period of time. Okay. So you see that as some sort of a generic term, whatever that may come to mean. It's not a term of art. That's my understanding. Okay. The ALJ's decision in this case is also different than the one in Mascio and more akin to the one in Sizemore, because the ALJ's decision incorporated the moderate or incorporated the decisions of the two state psychologists. It's a separate distinction you're making there. Yes, it is. Thank you, Your Honor. It also incorporated the limitations from the state psychologists, which specifically noted that Mr. Perry was able to stay on task for two hours at a time and that he had difficulty doing difficult tasks but could do shorter, more routine tasks. And I'd like to point out, contrary to my colleague's assertion, the state psychologist never said that he should be limited to one or two-step tasks. The state psychologist's opinion is that administrative record 87, and at that 81 through 89 is the full opinion, and at 87 Dr. Evans talks about how Mr. Perry is limited to not doing difficult tasks as opposed to one- or two-step tasks. And because unlike in Mascio, the state agency doctors did not have any more granular assessments than just that the individual had moderate limitations in concentration, persistence, and pace. The decision here is much more specific and much more limited to the specific limitations that Mr. Perry had. Can you explain how the ALJ accounted for the particular mental limitations of this claimant? I'm sorry. That's the other issue in this case, is how the ALJ specifically considered the mental limitations of the claimant in this case, which is another point that Mascio highlighted. He didn't directly talk about them, did he? Or she, I'm sorry. It's a she, the ALJ. The ALJ did specifically talk about the- Where is that? It's at Administrative Record 36. So at Administrative Record 36, the ALJ notes that Mr. Perry had met or partially met all of his speech therapy goals, and those speech therapy goals are 10 months of goals that go through his ability to respond to directions. And at the end of that 10 months, Mr. Perry had a 100% accuracy rate for three-step instructions, and contrary to my colleague's assertion, he could recite a 10-sentence word 80% of the time. So eight times out of 10, he could actually recite back a 10-sentence word. And after 10 months of assessment, the speech therapist determined that he had met all of these goals. And that's at Administrative Record page 726 to 727. And additionally, the ALJ noted at Administrative Record 36 that he had only mild issues with forgetfulness and memory problems. And so as a result of those limitations, the ALJ specifically noted that she was limiting him to unskilled work, which the regulations define as simple tasks as opposed to difficult tasks. And this, again, is directly in line with what the state psychologist determined at Administrative Record 87, that Mr. Perry was not able to complete difficult tasks, but he could do simple, routine tasks. So in those ways, the ALJ specifically limited him. Well, I guess you're saying that the fact that he didn't utter the magic words directly as to his specific mental limitations didn't say what the diagnoses were, but accounted for them in the description of what he could or could not do, that that's enough? Is that what you're saying? Yes, Your Honor. I would say that an administrative law judge does not need to utter any particular magic words. But here the ALJ did specifically identify the limitations that Mr. Perry had in terms of his forgetfulness and specifically referenced the speech therapist's notes regarding his ability to follow instructions. And as a result of that, limited him to unskilled work, which is simple work. So in that sense, the ALJ did fully encompass the mental deficiencies. And also, as previously noted, the ALJ also limited him to a non-production-oriented work setting. With respect to Macio. Did the ALJ, did she actually mention his mental difficulties when describing the second hypothetical? I'm sorry, the second? With respect to residual functioning in the opinion. I would have to go back and look at the testimony itself. But I believe that she did specifically identify that he could only be in unskilled work in a non-production-oriented work setting. Go ahead. But so then we're back, I think, to this non-production work setting doing a lot of important work. Because if the concern is not about, you know, the number of instructions that can be involved and how skilled the laborer is, but the persistence and the pace issues, you're suggesting that was all covered by this reference to the non-production-oriented work setting. That's correct, Your Honor. That is the limitation that the ALJ provided. And so to Judge Diaz's question, with respect to the hypothetical provided to the vocational expert, she did provide that he could only do unskilled work and only in a non-production-oriented work setting. But did not specifically state, I don't believe, did not specifically state anything with respect to forgetfulness or go into the specific symptomology that Mr. Perry had and instead only talked in terms of his residual functioning. That seems like, to me, that seems like a really important distinction from Sizemore. Because in Sizemore, if I'm remembering right, they said it has to be the RFC was limited to non-skilled, the same non-production work setting, and low stress. Like that was added in there so that when the vocational expert got the hypothetical, the expert could consider whether a job like, say, mail sorting, although it was unskilled and perhaps not production-oriented, might still come at such a fast pace that it would be stressful. But here, nothing put the vocational expert on notice that this had to be a low stress, not incredibly fast-moving job. The ALJ did not include any limitation in the RFC with regard to the stress level of the work and didn't find that there was any medically determinable issue with regard to the level of stress. The state psychologists also did not note the level of stress that Mr. Perry could withstand. Was there any evidence in the record about his inability to withstand some degree of stress? The medical records do discuss that with increased stress, he gets flustered and he needs to, and his accuracy with respect to instructions decreases. But the speech therapists and the neurologists overall felt like he was doing remarkably well and that he was able to follow instructions. And additionally, his self-assessments demonstrated that he was able to care for himself, he was able to cook for himself, he could perform household tasks without direction, that he was largely independent. And in fact, he told his physical therapist just three weeks after the stroke that he was fully independent in all of his tasks of daily living. Additionally, with respect to my colleague's assertion that the state psychologist's records should be rejected because they aren't supported by the medical evidence, this is simply not the case. The state psychologists specifically identified the medical records that they went through, and Dr. Evans detailed in extensive detail at pages 81 to 82 of the administrative record. Her specific consideration of Mr. Perry's response to instructions and all of the outcomes of his speech therapy in coming to the assertion that Mr. Perry had only moderate limitations in concentration, persistence, and pace. Additionally, Dr. Evans noted that she had spoken with Mr. Perry prior to making her assessment and that Mr. Perry was able to carry on a conversation, that he was a good historian, that he didn't have any speech issues, and that he was able to discuss his medical issues and his medical treatment. And based on all of this, the state agency psychologists determined that Mr. Perry was able to, or had only limited moderate limitations in concentration, persistence, and pace, that he was able to work a full 40-hour workday, that he was able to maintain concentration for two hours at a time, and that he could perform work with only infrequent breaks caused by his symptomology. So the state psychologists did take into account the entire longitudinal record in coming to their assessment. And then the ALJ explicitly considered the state psychologists' opinions and considered them only to the extent that they were consistent with the medical records, and specifically noted that they were consistent with several sections of the administrative record, including 3E, 6E, 13F, 6F, and Mr. Perry's own testimony regarding his capabilities. So based on all of that, the ALJ determined that the state psychologists' opinions could be afforded great weight. And based on that, she provided the RFC that he was limited to only unskilled work in a non-production-oriented work setting, and allowed the vocational expert to opine on whether or not he could perform work. Because the RFC was supported by substantial evidence, the Social Security Administration respectfully requests that this court affirm the district court's decision, that the ALJ's decision was supported. Thank you very much. Ms. Boehner, do you have some time on rebuttal? If I may, Social Security has suggested that the state agencies did not find one- they're taking one part of the opinions and not others. You will find the findings that he could perform one- and two-step tasks in the record at 86, 90, 91, and 102. The ALJ you were asking about, Monsieur, the ALJ in this case found that Mr. Perry had moderate deficits of concentration. Directly, Monsieur, but also completing tasks, reading, memory, understanding instructions. Those are obviously not covered by unskilled work in a non-production setting. Can I ask you what you think that means, non-production-oriented work setting? I have absolutely no idea. If one means a quota, an assembly line, you should say so. I have no idea. It doesn't have a regulatory meaning. I'm sorry. We definitely know that unskilled tasks do not account for Mr. Perry's hand tremors, and the judge herself saw those. And when that was last tested, you could only- his manual dexterity was 40% below normal. Neurologist. The neurologist is not a psychologist. He is not an expert in cognition. He did not test for it, as you'll see if you look at his records. Physical therapy. Physical therapy is not going to correct a neurological hand tremor. Physical therapy is not going to address fatigue. So it made perfect sense that he didn't need physical therapy after the first couple of weeks. Now in Hines v. Barnhart, this court has held that state agency opinions cannot be credited. When they contradict evidence that is in the record, but the record itself, the objective record, the statements are there. The state agency opinions cannot on their own overcome the evidence, largely because they've never laid eyes on him and also because-I won't go there. You asked also for additional information about his physical difficulties. He did also state that he was overwhelmed by doing multiple tasks. He could only do three or four hours of lighthouse work a week. And in the case law, both Sims v. Atfill and Cook v. Heckler have held that the agency is responsible, not Mr. Perry, who certainly couldn't afford it, for getting the required neuropsychological testing and an opinion. He couldn't afford an opinion. He doesn't have any money. He has no income. He has no health insurance. One of the most important things here is that he couldn't do anything on his own. He was not independent in driving. He was not independent in cooking. And the agency says, especially listing 1202 or 1200, he has to be able to perform independently, appropriately, and effectively on a consistent basis. Being able to carry on an occasional conversation doesn't show he could do any of those things. In addition, the ALJ found that Mr. Perry did not meet the listings. And I'm addressing specifically listing 1202A7. Under 1202A7, the only way an ALJ can assess that is for organic mental disorders. And the only way she can assess that is with specific comprehensive neuropsychological testing, such as the Halstead-Wrighton. In fact, it gives that example in the regulation. She didn't have it. She had to go get it. She didn't do it. And that can't be cured. Neuropsychological testing on remand will not tell us what he was capable of doing in 2013. And all Mr. Perry had to do was show that he was disabled in that first 12 months. Have I answered your question? Anything else you want to tell us today? I don't think so. Thank you very much.
judges: G. Steven Agee, Albert Diaz, Pamela A. Harris